Jennifer **LOPER** and William Kaye, on behalf of themselves and all other persons who are similarly situated, Plaintiffs,

v.

**NEW YORK CITY POLICE DEPARTMENT, and Lee P. Brown, as the Commissioner of Police of the New York City Police Department, Defendants.**

**No. 90 Civ. 7546 (RWS).**

United States District Court, S.D. New York.

June 17, 1991.

George Sommers, New York City, and Hoboken, N.J., for plaintiffs.

Victor A. Kovner, Corp. Counsel for City of New York, New York City, for defendants; Ira J. Lipton, Bruce Rosenbaum, of counsel.

## OPINION

SWEET, District Judge.

Plaintiffs Jennifer Loper ("Loper") and William Kaye ("Kaye"), who are New York City residents, and the class they represent have moved pursuant to Rule 56, Fed.R. Civ.P. for summary judgment upon their 42 U.S.C. § 1983 complaint against defendants New York City Police Department (the "City") and its Commissioner Lee P. Brown ("Brown"). The City has cross moved for summary judgment to dismiss the complaint. For the reasons set forth below, both motions are denied.

### Prior Proceedings

Loper and Kaye filed their complaint in this action and moved for class certification on November 23, 1990. On that same day, they commenced an action in the New York State Supreme Court (the "state court action"). Upon the agreement of the parties, the state court action has been adjourned pending the outcome of the proceedings in this court.

Oral argument on the class certification motion was heard on December 21, 1990. In an opinion of April 2, 1991, the court granted Loper's and Kaye's motion for class certification. 135 F.R.D. 81 (S.D.N. Y.).

On February 4, 1991, Loper and Kaye filed a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P. The Police Department subsequently filed a cross motion for summary judgment. Oral argument on the summary judgment motions was heard on March 8, 1991, and the summary judgment motions were considered submitted as of that date.

### The Facts

### The Plaintiffs

Loper has been homeless since October of 1990. Since leaving the care of her parents and quitting high school sometime in 1989 until she became homeless, Loper has stayed in a Westchester County halfway house, in a rented apartment in the East Village of New York, and with various friends. She has never stayed in a New York City shelter or a privately run shelter for homeless persons. Loper has applied for public assistance benefits from New York City, but has not yet completed the necessary paperwork. Loper has begged from people on the streets and in the parks of New York City since October of 1990.

Kaye arrived in New York City from his mother's house in Bayport, Long Island in August of 1990. He has been homeless since that time, and living on the streets of the East Village. Before his arrival in New York City, Kaye had experienced an eight month period of homelessness in Long Island, during which time he obtained emergency shelter from various agencies. Kaye has never stayed in a New York City shelter or a privately run shelter for homeless persons and has never applied for public assistance from a New York City agency.

Both Loper and Kaye beg in the East village section of Manhattan. Their usual practice is to stand in the street or park and say to passersby: "Can you spare some change for something to eat?" or "Spare any change for some food, sir or ma'am?" They occasionally engage in conversation with people from whom they beg. Kaye has testified that the police have stopped him from begging between seven and ten times. Loper has testified that the police have stopped her from begging between five and ten times. Generally, the police officers put a stop to Loper's and Kaye's begging by asking them to move along.

### The Statute

New York State Penal Law (the "Penal Law") § 240.35(1) (McKinney's 1989) provides that:

A person is guilty of loitering when he:
Loiters, remains or wanders about in a public place for the purpose of begging.

Neither Loper nor Kaye has been arrested pursuant to the Penal Law.

### Discussion

#### Summary Judgment Standard

Under Rule 56, a motion for summary judgment shall be granted when the moving party demonstrates as a matter of law that he is entitled to that remedy because there are no genuine issues of material fact present in the action. *H.L. Hayden Co. v. Siemens Medical Systems, Inc.,* 879 F.2d 1005, 1011 (2d Cir.1989). The moving party, however, has the burden of demonstrating the absence of any genuine issue as to all the material facts, and the non-moving party is entitled to all favorable inferences that may be drawn from the evidence. *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 444–45 (2d Cir.1980).

#### The Summary Judgment Motion of Loper and Kaye

Loper and Kaye initiated this action under 42 U.S.C. § 1983 seeking a declaration that the Penal Law violates the First, Eighth and Fourteenth Amendments to the Constitution of the United States as well as the Constitution of New York State.

In any § 1983 action, the initial inquiry must focus on whether the two elements essential to a § 1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981).

■ The first prong is not disputed for the purposes of this motion. With regard to the second prong, Loper and Kaye's evidence consists of affidavits describing their personal histories and the pattern of their lives in the streets and parks of New York. Assuming *arguendo* that begging is a right secured by the Constitution, Loper and Kaye's affidavits fall short of establishing a constitutional deprivation. For example, it is unclear from the evidence what effect the police's orders to "move along" have on Loper's and Kaye's ability to beg.[1]

In short, at this early stage of the litigation, before discovery has taken place, the existing evidence is insufficient to establish an injury under § 1983 sufficient to grant Loper and Kaye's summary judgment motion. *See Caulfield v. Bd. of Educ.,* 583 F.2d 605 (2d Cir.1978) (affirming trial court's denial of preliminary injunction in § 1983 action where plaintiffs did not adduce evidence of irreparable injury); *McCann v. Coughlin,* 698 F.2d 112, 126 (2d Cir.1983) (citations omitted) (in § 1983 action for damages, plaintiffs must establish "actual injury.").

Accordingly, Loper's and Kaye's summary judgment motion is denied at this time, with leave to renew upon the completion of discovery.

#### The Summary Judgment Motion of the City

### I. The First Amendment Claim

■ In support of its summary judgment motion, the City asserts with regard to Loper and Kaye's First Amendment claims, that as a matter of law, begging is not speech and therefore is not protected by the First Amendment. In support of this proposition, the City cites *Young v. New York City Transit Authority,* 903 F.2d 146 (2d Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990), in which the Second Circuit, in the face of a similar constitutional challenge, upheld New York City Transit Authority regulations prohibiting begging and panhandling in the New York City subway system.

---

**1.** Indeed, one commentator notes that such a request to move on, made by police pursuant to a narrowly drafted loitering or anti-vagrancy statute, may be constitutional, at least with respect to void for vagueness challenges. *See* Note, *Orders to Move On and the Prevention of Crime,* 87 Yale L.J. 603 (1978).

## A. The Decision in Young

In *Young*, the Court of Appeals reversed an opinion of the Honorable Leonard B. Sand of this District Court which had enjoined the Transit Authority from enforcing the regulations on the grounds that begging can be expression protected by the First Amendment, that parts of the New York City subway system constitute a public forum, and that the regulations were not narrowly tailored to serve the state's interest. *Young v. New York City Transit Authority*, 729 F.Supp. 341 (S.D.N.Y. 1990), *rev'd in part, vacated, in part,* 903 F.2d 146 (2d Cir.1990), *cert. den.,* — U.S. ——, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990).

Initially, the Court of Appeals considered whether begging was speech, and as part of that analysis, distinguished the Transit Authority regulations from the provisions considered in a trilogy of cases relied upon by the District Court which held that charitable solicitation enjoys First Amendment protection. *Riley v. Nat'l Federation of Blind,* 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988); *Secretary of State of the State of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984); *Schaumburg v. Citizens for Better Environment,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980). The second part of the opinion examined the Transit Authority regulations in light of the standards for evaluating restrictions on expressive conduct set forth in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), and concluded that the regulations were justified on the grounds that they left open alternate channels of communication. The third part of the opinion applied public forum analysis and found that the Transit Authority never intended to designate sections of the subway system as a place for "begging and panhandling." *Young,* 903 F.2d at 161.

Given its structure and method of analysis, the Court of Appeals opinion in *Young* appears to rest primarily upon its *O'Brien* analysis to the effect that the regulations are not unduly restrictive and, therefore, seems able to stand without the leg that considers whether begging is speech[2].

In considering this question, the Court of Appeals first expressed doubt as to whether begging was fully protected speech and determined, rather, that "the real issue here is whether begging constitutes the kind of 'expressive conduct' protected to some extent by the First Amendment." *Id.,* at 153.[3] While the court indicated its belief that "speech simply is not inherent to the act [of begging]; it is not of the essence of the conduct," the court implied that its remarks to this effect should be regarded as dicta: "our holding today does not rest on an ontological distinction between speech and conduct...." *Id.,* at 154. In addition, at least some of the *Young* court's thoughts regarding begging's status as speech apply only to the particularized instance of subway begging ("we wonder whether the conduct [begging] is not divested of any expressive element as a result of the special surrounding circumstances involved in this case ... in the subway." *Id.,* at 154). *See also id.,* at 156, ("[I]n the instant case, the difference [between begging and solicitation by organized charities] must be examined not from the imaginary heights of Mount Olympus but from the very real context of the New York City subway.").

Moreover, the Court of Appeals' decision to proceed to the second part of its analysis (consideration of the *O'Brien* standard) having assumed *arguendo* that "begging and panhandling possess some degree of a

---

2. The opinion also stands without its public forum analysis: Whether the subway is a public forum is "not necessary to our holding in this case." *Young,* 903 F.2d at 161.

3. Both pre- and post-*Young* commentators have taken issue with the approach adopted by the Second Circuit in *Young, viz.,* that begging might be considered at most only expressive conduct and not fully-protected speech. *See*

Hershkoff and Cohen, *Begging to Differ: The First Amendment and the Right to Beg,* 104 Harvard L.Rev. 896 (1991); Ciampi, *A Buberian Approach to Constitutional Analysis: So That We May Be Able to Face Our Poorer Brethren Eye to Eye,* 65 St. John's L.Rev. 325 (1991); Note, *The Beggar's Free Speech Claim,* 65 Indiana L.J. 191 (1989).

communicative nature," *id.*, at 157, leaves open the issue of begging's status. Granted, after making such an assumption, the court upheld the regulations on the grounds that, applying the analysis in *O'Brien,* 391 U.S. at 367, 88 S.Ct. at 1673, "[t]ime, place, and manner restrictions ... are sustainable if they ... do not unreasonably limit alternative means of communication." *Young,* 903 F.2d at 157. The fact that the Court of Appeals upheld the regulations while acting under this assumption does not necessarily indicate that the court held that begging is not speech or conduct of any sort that might in some circumstances deserve some degree of First Amendment protection. In other words, while the opinion in effect holds that the regulations are permissible even if begging is expressive conduct, the Court of Appeals did not resolve the issue of begging's status in order to decide the question before it.[4]

### B. *Begging: The Speech Interests Involved*

It is not necessary for the purposes of the instant motion to reach a final conclusion concerning begging's status as speech. On the one hand, *Young* can be read to instruct the court in the instant motion to assume that begging is some sort of expressive conduct and to evaluate the Penal Law under the *O'Brien* standard. On the other hand, it could be concluded that the Court of Appeals did not fully consider and reject all of the possible speech interests that begging might implicate.

To consider such interests more fully, it is necessary to return to the *Schaumburg* trilogy. In *Schaumburg,* the Court struck down a statute which prohibited solicitation of contributions by charitable organizations that did not use at least 75 percent of their receipts for charitable purposes. The Court noted that "charitable appeals for funds, on the street or door to door, involve a variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment." *Schaumburg,* 444 U.S. at 632, 100 S.Ct. at 833. The Court held that solicitation is "characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political or social issues...." *Id.* The Court further observed that for these reasons, and because charitable solicitation does more than inform private economic decisions and is not concerned primarily with providing information about the characteristics of goods and services, charitable solicitation enjoys greater protection under the First Amendment than does communication that is solely commercial speech. *Id.* (such solicitation "has not been dealt with in our cases as a variety of purely commercial speech.").

In *Riley v. Nat'l Fed'n of Blind of N.C.,* 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988), the Court struck down a statutory scheme designed to regulate fees charged by professional fundraisers who engage in charitable solicitations. Under the scheme, a fee consisting of 20% of the gross receipts was deemed reasonable; a fee between 20 and 35% was deemed unreasonable upon a showing that the solicitation did not involve the "dissemination of information, discussion or advocacy relating to public issues as directed by the [charitable organization] which is to benefit from the solicitation"; a fee exceeding 35% was presumed unreasonable, but the fundraiser had the opportunity to rebut the presumption by demonstrating that the fee was necessary either "(1) because the solicitation involved the dissemination of information or advocacy on public issues directed by the charity, or (2) because otherwise the charity's ability to raise money or com-

---

**4.** In its memorandum of law, the City cites *International Society for Krishna Consciousness, Inc. v. Lee,* ("*ISKCON*"), 925 F.2d 576 (2d Cir. 1991) for the proposition that the Second Circuit has construed *Young* as holding that begging is not the type of expressive conduct the First Amendment protects. However, the Court of Appeals' amended opinion in *ISKCON,* dated February 25, 1991, omits both the reference to and the interpretation of *Young* offered in the earlier version dated February 8, 1991. *See ISKCON* at 579.

municate would be significantly diminished." *Id.*, at 785–86, 108 S.Ct. at 2671–72.

The Court in *Riley* further rejected the argument that the North Carolina statute regulated only commercial speech on the grounds that the statute related only to the professional fundraiser's profit from the solicited contribution. "It is not clear that ... speech is necessarily commercial when it relates to that person's financial motivation for speaking.... But even assuming, without deciding, that such speech in the abstract is merely 'commercial,' we do not believe that the speech retains its commercial character when it is inextricably intertwined with otherwise fully protected speech." *Id.*, at 796, 108 S.Ct. at 2677.

Thus, at the very least, the *Schaumburg* line of cases teaches that speech relating to charitable solicitation is so intertwined with fully protected speech—even when the solicitor is working in part for his own benefit (as in the case of the professional fundraiser)—that it is impossible to separate the two strands for First Amendment purposes; the one therefore must share in the protections traditionally accorded the other.

As the Court of Appeals pointed out in *Young,* however, begging may not be analogous to, and deserving of, the constitutional protections afforded charitable solicitation. *See Young,* 903 F.2d at 155 (neither *Schaumburg* nor its progeny stand for the proposition that begging and panhandling are protected speech under the First Amendment). Accepting the narrow

reading of the *Schaumburg* line of cases as set forth in *Young,* nothing in the *Schaumburg* trilogy precludes the view that begging, even if it does not stand on a constitutional footing with charitable solicitation, contains some elements of speech that should be accorded, at the very least, the protections deemed appropriate for commercial speech.

In *Riley* and in *Schaumburg,* for example, the Court considered the argument that charitable solicitations are commercial speech. It concluded that charitable solicitation was not purely commercial speech, but that at the very least, such charitable solicitation contained elements worthy of the higher degree of First Amendment protection accorded other forms of speech. *See Riley,* 487 U.S. at 796, 108 S.Ct. at 2677 ("It is not clear that ... speech is necessarily commercial when it relates to that person's financial motivation for speaking."); *Schaumburg,* 444 U.S. at 632, 100 S.Ct. at 834 (charitable solicitation "has not been dealt with in our cases as a variety of *purely* commercial speech") (emphasis added).

Like the charitable solicitation by a professional fundraiser at issue in *Riley,* begging is conduct in which the beggar has a financial motivation for speaking. If it is not to be accorded the level of First Amendment protection reserved for charitable solicitation, begging may well constitute expression that falls within the commercial speech doctrine.[5]

---

**5.** That begging at the very least is expression worthy of the limited First Amendment protections accorded commercial speech is not inconsistent with the Supreme Court's teachings in those cases in which the Court has considered the question of what is commercial speech. Commercial speech is "expression related solely to the economic interests of the speaker and its audience," *Central Hudson Gas & Electric Corp. v. Public Ser. Comm.,* 447 U.S. 557, 561, 100 S.Ct. 2343, 2348, 65 L.Ed.2d 341 (1980). Speech does not lose its protection even though "it may involve a solicitation to purchase or otherwise pay or contribute money." *Virginia Pharmacy Bd. v. Virginia Consumer Council,* 425 U.S. 748, 761, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976) (citing *New York Times Co. v. Sullivan,* 376 U.S. 254, 266, 84 S.Ct. 710, 718, 11 L.Ed.2d 686 (1964); *NAACP v. Button,* 371 U.S. 415, 429, 83 S.Ct. 328, 3, 9 L.Ed.2d 405 (1963); *Jamison v.*

*Texas,* 318 U.S. 413, 417, 63 S.Ct. 669, 672, 87 L.Ed. 869 (1943); *Cantwell v. Connecticut,* 310 U.S. 296, 306–07, 60 S.Ct. 900, 904–05, 84 L.Ed. 1213 (1940)).

Furthermore, the validity of considering begging under the rubric of the commercial speech doctrine is not explicitly called into question by the *Young* opinion. The question of whether begging would merit the protection afforded commercial speech is in fact not addressed in *Young,* notwithstanding dicta to the effect that the "only message ... common to all acts of begging[—]that beggars want to exact money from those whom they accost[—] ... falls far outside the scope of protected speech under the First Amendment." *Young,* 903 F.2d at 154. In making this statement, the *Young* court considered only how begging did not meet the standards of traditional, pure speech of the type protected by the First Amendment. *Id.* ("We

### C. The Constitutionality of the Penal Law: Weighing the Interests Involved

For the purposes of the instant motion, the review of the constitutionality of the Penal Law merits consideration of the principles underpinning the appropriate test rather than a mechanical application of such a test to the present circumstances. Evaluating the constitutionality of the Penal Law under either the expressive conduct (*O'Brien*) standards or under the tests for commercial speech requires consideration of both the nature of the activity being limited and the interests of the state involved in limiting such activity.[6]

Justice Frankfurter's observation in a case that addressed the balancing of First Amendment interests with those of the state provides a good starting point: "Wise accommodation between liberty and order always has been, and ever will be, indispensable for a democratic society." *Kovacs v. Cooper,* 336 U.S. 77, 89, 69 S.Ct. 448, 454, 93 L.Ed. 513 (1949) (Frankfurter, J., concurring) (state ordinance forbidding the operation of sound trucks on public streets does not infringe First Amendment rights).

It is this "wise accommodation" that the various forms of First Amendment analysis—public forum analysis, time place and manner analysis, expressive conduct analysis, and commercial speech analysis—seek to reach. For example, in cases where the proposed restriction applies to speech on a street, in a park or some other public place, the mere determination that the restrictions on speech involve a public forum does not end the inquiry. Instead, courts then consider the state's interest in creating the regulation, and whether such regulation is narrowly tailored to serve that interest. Thus, even complete bans on certain means of expression in a public forum or on public property have been upheld. *See Frisby v. Schultz,* 487 U.S. 474, 481, 108 S.Ct. 2495, 2500, 101 L.Ed.2d 420 (1988) (complete ban on picketing in residential streets narrowly tailored to serve state's interest in protecting the tranquillity of the home); *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 805, 104 S.Ct. 2118, 2128, 80 L.Ed.2d 772 (upholding municipal

---

certainly do not consider [begging] as a 'means indispensable to the discovery and spread of political truth'" (quoting *Whitney v. California,* 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., joined by Holmes, J., concurring))); *id.* ("Nor do we deem [begging] as communicating one of the 'inexpressible emotions' falling ''under the protection of free speech as fully as do Keats' poems or Donne's sermons.''" (quoting *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (quoting *Winters v. New York,* 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948) (Frankfurter, J., dissenting)))). Thus, the court did not appear to rule out the possibility that begging might meet at least the commercial speech standards and should therefore be accorded similar protection by the First Amendment.

Likewise, that begging could at least be considered under the commercial speech doctrine is not ruled out by those commentaries which argue for the view that begging should be viewed as speech deserving of full First Amendment protection rather than as commercial speech deserving of limited protection. *See* Hershkoff and Cohen, *Begging to Differ: The First Amendment and the Right to Beg,* 104 Harvard L.Rev. 896, 907–08 (1991); Note, *The Beggar's Free Speech Claim,* 65 Indiana L.J. 191, 216–17 (1989).

**6.** *See, e.g., Central Hudson Gas & Elec. Corp. v. Public Service Comm.,* 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980) (four part analysis for determining the constitutionality of bans or limits that a government might seek to impose on commercial speech: (1) whether the ban or restriction concerns activity that is lawful and not misleading; (2) whether the government interest in banning the activity is substantial; (3) whether the restricting regulation directly advances the governmental interest asserted; and (4) whether such regulation is not more extensive than necessary to serve that interest.); *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968) (as quoted in *Young,* 903 F.2d at 157) (four part analysis for determining the constitutionality of restrictions on expressive conduct) ("'a government regulation is sufficiently justified' when: (1) 'it is within the constitutional power of the Government;' (2) 'it furthers an important or substantial government interest;' (3) 'the government interest is unrelated to the suppression of free expression;' and (4) 'the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest'").

The consideration of the elements of the commercial speech test in the context of the pending summary judgment motion should not be seen as a resolution of the issue.

code section prohibiting the posting of signs on public property where state has an interest in upholding aesthetics) (applying the four-part analysis set forth in *O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), an evaluation similar to a time, place, and manner determination. *Young*, 903 F.2d at 157).

While the weight to be accorded to the state and to the speech interests may vary across these several tests, thereby affecting the outcome, in all cases the underlying goal remains the same: to achieve this "wise accommodation." Therefore, an attempt to apply the four-step commercial speech or expressive conduct tests should not lose sight of this goal, the weighing of the First Amendment's interests (liberty) with those of the state (order). Here, the existence of unresolved factual issues as to the nature or the extent of the City's interests requires denial of its motion.

1. The Nature of the Activity at Issue

As set forth above, *Young* suggests that the type of interests involved—and the degree of protection such interests merit—may vary according to the facts of the case and the scope of the regulation at issue. Therefore, the court can determine the exact nature of the activity sought to be banned by the Penal Law only after a factual evaluation.

In support of its summary judgment motion, the City adduces evidence intended to show that, as a factual matter, begging is an activity which, for the most part, has not been tolerated throughout our nation's constitutional history. The City has submitted a documentary appendix as evidence that at the time of the ratification of the First Amendment, at least eight out of the

fourteen states in the Union had statutes outlawing begging. As additional support for such a proposed finding, the City in its brief cites the opinion of the District Court in *Young*, in which Judge Sand listed 27 states that currently have laws which limit begging in some fashion. *Young*, 729 F.Supp. at 354–55, n. 23–26.

However, the existence of anti-begging laws in 27 states is consistent with more than one factual interpretation. Indeed, Judge Sand's opinion in *Young*, which traces the history of anti-begging statutes to their roots in Elizabethan England, reaches a different conclusion: "Though begging has been regulated, monitored and at times prohibited throughout history, there is nothing to suggest that begging has been universally viewed with the rancor and enmity of, say, obscenity," *Id.*, at 353 (citation omitted).[7] Judge Sand's opinion in part based its findings regarding the historical treatment of begging on the common-law distinction which the Elizabethan poor laws drew between the solicitation of alms by the able-bodied capable of work ("vagrancy"), and begging by those who have no other means of support. *Young*, 729 F.Supp. at 353–4. In early English common law, moreover, localities licensed beggars unable to work and restricted them to specific areas where begging was permitted. *Id.* This common-law distinction was incorporated within several of the state statutes in existence at the time of the ratification of the Bill of Rights. *See* the statutes of Virginia, South Carolina, New York in Appendix A of the City's brief. It also forms the basis of several of the current state laws which prohibit vagrancy. *Young*, 729 F.Supp. at n. 24.[8]

---

7. Indeed, one commentator points out that such antagonism as has occurred "may be misdirected, because it is based on an insensitive misunderstanding of the reasons that people turn to the streets." Note, *The Beggar's Free Speech Claim*, 65 Indiana L.J. 191, 198 (1989).

8. In fact, the Supreme Court has stated that much of the rationale behind the creation of the Elizabethan poor laws is inapplicable to our present conditions, yet their "archaic classifications remain." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1971). *See Ledwith v. Roberts,*

[1937] 1 K.B. 232, 271 (cited in *Papachristou, supra* n. 4) ("The early Vagrancy Acts came into being under peculiar conditions utterly different to those of the present time.... [T]he notorious 'brotherhood of beggars' [ ] flourished in the 16th and 17th centuries. They were a definite and serious menace to the community and it was chiefly against them and their kind that the harsher provisions of the vagrancy laws were directed."

The adoption and evolution of the various forms of vagrancy laws in England and later in the United States is the subject of much histori-

As evidence that begging is currently viewed with disfavor, the city submits that society's fear of more serious crime increases when less harmful disorderly behavior, such as begging, goes unchecked. *See* discussion of Kelling Affidavit *infra*, Part 2(a).

Loper and Kaye dispute the conclusions to be drawn from the evidence of the current and historical treatment of begging as set forth by the City. They submit that the current begging statutes are no longer enforced. They further dispute the view that the mere existence of anti-begging laws around the time of the enactment of the First Amendment, without additional evidence, indicates the Framers' intent to refrain from bringing begging within the scope of the protections afforded by the First Amendment.

Moreover, the submissions on the instant motion fail to establish the factual circumstances surrounding the implementation of the Penal Law and the City's enforcement of it. The City has not submitted evidence on a number of important factual issues relating to the state's implementation of this particular form of anti-begging law and the City's resulting enforcement of it: no empirical evidence has been submitted concerning the causes and effects of begging in today's New York; nor has evidence been adduced concerning the actual enforcement of either anti-begging statutes at the state level, or anti-begging ordinances at the local level, and the effects of such enforcement.

In sum, substantial factual issues remain concerning the nature and effect of begging and the enforcement of the penal law. Such issues are relevant to the application of either the *O'Brien* or *Central Hudson* tests.

### 2. The City's Interests

Furthermore, under either the *O'Brien* or *Central Hudson* tests, it is important to judge the substantiality of the City's interest in regulating the particular behavior in question and to consider the relationship between this interest, the manner of regulation, and the activity being limited. *See Central Hudson Gas & Elec.*, 447 U.S. at 566, 100 S.Ct. at 2351 ("whether the asserted governmental interest is substantial" and "whether the regulation directly advances the governmental interest asserted"); *Young*, 903 F.2d at 157 (whether the regulation "furthers an important or substantial governmental interest" and whether "the governmental interest is unrelated to the suppression of free expression") (outlining the *O'Brien* test).

### (a) *Police Power*

In support of its position that it has an interest in banning begging from its streets and public parks, the City points to its police power. The Supreme Court has found a state or local government's police power to be "broad and inclusive" and to represent values that are "spiritual as well as physical, aesthetic as well as monetary." *Taxpayers for Vincent*, 466 U.S. at 805, 104 S.Ct. at 2129 (quoting *Berman v. Parker*, 348 U.S. 26, 33, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954)). Indeed, the lawful extension of a government's police power goes "beyond health, morals and safety and comprehends the duty, within constitutional limitations, to protect the well-being and tranquillity of the community." *Kovacs*, 336 U.S. at 83, 69 S.Ct. at 451. In sum, a city or state may exercise its police power to "protect its citizens from unwanted exposure to certain methods of expression which may legitimately be deemed a public nuisance." *Taxpayers for Vincent*, 466

cal documentation and commentary. *See generally*, Note, *The Vagrancy Concept Reconsidered: Problems and Abuses of Status Criminality*, 37 N.Y.U.L.Rev. 102 (1962); Sherry, *Vagrants, Rogues and Vagabonds—Old Concepts in Need of Revision*, 48 Calif.L.Rev. 557 (1960); Foote, *Vagrancy-Type Law and its Administration*, 104 U.Pa.L.Rev. 603 (1956); C.J. Ribton–Turner, *A History of Vagrants and Vagrancy and Beggars and Begging* (1887). While often addressing the

subject as a whole generally and not begging specifically, the commentary frequently speaks to the differences between the societal conditions and circumstances of England and the United States at the time the statutes were adopted versus the conditions of the present day. Indeed, as the vagrancy laws evolved over time, different rationales provided the justification for the various forms the statutes took.

U.S. at 805, 104 S.Ct. at 21 (citing *Kovacs,* 336 U.S. at 77, 69 S.Ct. at 448).

In support of its asserted power to maintain public order, the City has adduced an affidavit of George Kelling, a professor at the College of Criminal Justice at Northeastern University and a fellow at Harvard University's Kennedy School of Government. In his affidavit, Kelling, a consultant to several metropolitan transit systems and the author of several research studies, sets forth his "broken window theory." The theory posits that, just as broken windows left untended are a sign of neglect and lead to more serious destruction and vandalism, so disorderly behavior when left untended leads to more serious crime. The "broken window theory" therefore constitutes expert testimony to support the City's interest in preventing disorderly behavior, lest such behavior lead to serious crime the prevention of which is within the police power of the City. However, no objective facts supporting the theory have been adduced, such as the number of beggars, where they beg and the effect of their begging both for them and the community.

The City must establish some factual record upon which it can be concluded that its interest in curbing disorderly behavior is "substantial." *Central Hudson Gas & Elec., supra,* 447 U.S. at 566, 100 S.Ct. at 2351. Here, there is no evidence to establish the alleged deleterious effects of begging, nor any statistics on the enforcement of the Penal Law, the places of enforcement, or the effects of enforcement. Other than anecdotally, the court has no reliable portrayal of the extent of the problem and its effect on the public interest. It is not enough to pose the legal issues naked of any factual record.

### (b) *Fraud Prevention*

In addition to its interest in protecting citizens from those "methods of expression which may legitimately be deemed a public nuisance," the City arguably has an additional interest when it seeks to protect its citizens from expressive conduct involving solicitation: fraud prevention. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 340, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974) ("Untruthful speech, commercial or otherwise, has never been protected for its own sake.").

Indeed, the State's interest in preventing fraud is encapsulated in the requirement for the purposes of commercial speech analysis that the speech sought to be regulated not be "misleading." *Central Hudson Gas & Elec.,* 447 U.S. at 566, 100 S.Ct. at 2351. In *Riley,* the State of North Carolina advanced the argument that the statute was narrowly tailored to the State's interest in preventing fraud. The Court acknowledged that "the interest in protecting charities (and the public) from fraud is, of course, a sufficiently substantial interest to justify a narrowly tailored regulation," *Riley,* 487 U.S. at 792, 108 S.Ct. at 2675, but concluded that such an interest did not justify a statute that restricted speech when the State had other means (albeit less efficient ones) of preventing occurrences of such fraud, *e.g.,* antifraud statutes and disclosure requirements for charities. *Id.,* at 795, 108 S.Ct. at 2676.

Certainly this interest in preventing fraud holds true in the case of begging as much as in the case of solicitation by an organized charity. The City and private organizations offer various services to provide food and shelter for the needy. Various City and State welfare programs furnish money and other benefits to those who meet specified qualifications. Therefore, whenever a person asks for money from passersby on the grounds that he is needy in some way, such speech may be in part fraudulent if indeed he is not truly needy because he can make use of these various welfare benefits.

However, the absence of evidence on this submission makes it impossible to determine the weight to be accorded the City's interest in fraud prevention. Nothing speaks to the effectiveness of the regulation in achieving this goal, nor is the availability of alternate means considered.[9]

9. Under either the *O'Brien* or *Central Hudson* tests, the court would have to consider whether

In sum, the existence of unresolved factual issues concerning: the historical treatment of begging; the rationale behind and the enforcement of the Penal law; and the nature of the City's police power and fraud prevention interests preclude granting the City's summary judgment motion at this time. Deciding the motion without the necessary facts would be like listening to the Three Penny Opera without the music of Kurt Weill.

## II.  Other Claims

As the factual issues relevant to Loper and Kaye's First Amendment claims remain, the court need not now consider the City's motion with regard to Loper and Kaye's other claims. Presumably, the discovery that will ensue will elicit facts applicable to the determination of these other claims.

*Conclusion*

For the reasons set forth above, both summary judgment motions are denied at this time, with leave to renew upon further discovery.

It is so ordered.

---

the Penal Law is narrowly tailored to achieve its desired goal. *See Young* 903 F.2d at 157 (outlining the *O'Brien* test) (whether "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest"); *Central Hudson Gas & Elec.,* 447 U.S. at 566, 100 S.Ct. at 2351 ("whether it is not more extensive than is necessary to serve that interest). The availability and effectiveness of alternate means for achieving the fraud prevention interest (as well as the police power interests) would, therefore, factor into this tailoring determination.