Jennifer **LOPER** and William **Kaye** on behalf of themselves and all other persons who are similarly situated, Plaintiffs,

v.

**NEW YORK CITY POLICE DEPARTMENT, and Lee P. Brown, as the Commissioner of the New York City Police Department, Defendants.**

No. 90 Civ. 7546 (RWS).

United States District Court,
S.D. New York.

Sept. 30, 1992.

George Sommers, New York City, and Hoboken, N.J., for plaintiffs.

O. Peter Sherwood, Corp. Counsel by Ira J. Lipton, Bruce Rosenbaum, Asst. Corp. Counsel, of counsel, New York City, for defendants.

## OPINION

SWEET, District Judge.

As Alfred Hitchcock, the master of cinematographic terror and suspense, is reported to have said, "terror results from disorder," and begging, the subject of the statute here under constitutional attack, over time has been viewed as the archetypical expression of disorder.[1] Since the early days of western civilization, people have sought to define the conduct that violates society's sense of order and that which society permits or even encourages.[2] Yet, as civilization as a whole has moved forward, people have learned time and again that suppressing speech and conduct deemed contrary to a society's sense of order merely masks the underlying disor-

1. One of the earliest discussions of the disorder caused by poverty and begging is found in *The Plutus* by Aristophanes, which was first performed around 388 B.C. Against the background of the emergence of the new god, Plutus (Wealth), in the Greek Pantheon, Aristophanes constructs a debate between the anthropomorphized character of Poverty and the central protagonist of Plutus, Chremylus. Poverty argues eloquently for the virtues of poverty and begging but is rejected by Chremylus as the source of human misery and social chaos. *See* Aristophanes, *The Plutus* 629, 635–36 (Benjamin Rogers trans., 5 Britannica Great Books 1952).

2. *See, e.g.,* Aristotle, *Politics* (B. Jowett trans., Princeton U. Press 1984); Plato, *Laws* (A.E. Taylor trans., Princeton U. Press 1963); Plato, *Republic* (Paul Shorey trans., Princeton U. Press 1963); Sophocles, *Antigone* (Sir Richard Jebb trans., 5 Britannica Great Books 1932); Thucydides, *History of the Peloponnesian War* 143–51, 156–64, 236–45 (Rex Warner trans., Penguin Books 1954); *see also* 4 William Blackstone, *Commentaries* \*169 ("The court also of Areopagus at Athens punished idleness, and exerted a right of examining every citizen in what manner he spent his time.").

der.[3] These motions for summary judgment require the resolution of a modern-day constitutional challenge to a statute which provides that loitering for the purpose of begging is a crime.

Out of the maelstrom of conflicting values, precedents, and decisional principles, against a background of established facts ambiguously interpreted, the determination is reached that the motion of the Defendants Police Department of the City of New York (the "Department," the "City") and Lee P. Brown, the Police Commissioner, to dismiss the complaint is denied, and the cross-motion of the named class plaintiffs, Jennifer Loper and William Kaye (the "Plaintiffs"), to declare the statute unconstitutional is granted.

Directly arrayed against each other are the requirements to maintain public order as determined by the legislative representatives of the society and the protection of free expression as guaranteed by the First Amendment of the Constitution. These contending principles are starkly presented in the setting of New York City, where "urban man must distinguish carefully between his private life and his public relationships."[4] And the issues raised by this case expose not only the inevitable tension between individual rights and the interests of society but the very rationality of our society in its commitment to the rights protected by the First Amendment. The problem is succinctly stated by Professor T.M. Scanlon, Jr.:

> The doctrine of freedom of expression is generally thought to single out a class of "protected acts" which it holds to be immune from restrictions to which other acts are subject. In particular, on any very strong version of the doctrine there will be cases where protected acts are held to be immune from restriction despite the fact that they have as consequences harms which would normally be sufficient to justify the imposition of legal sanctions. It is the existence of such cases which makes freedom of expression a significant doctrine and which makes it appear, from a certain point of view, an irrational one.... To answer this charge of irrationality is the main task of a philosophical defense of freedom of expression.

Thomas Scanlon, *A Theory of Freedom of Expression*, 1 Phil. & Pub.Aff. 204, 204 (1972).

The case at hand is precisely the sort that brings the apparent irrationality of the doctrine of the freedom of expression into sharp relief. Because I acknowledge the disorder inherently associated with and manifested by this form of expression, to wit, a kind of disorder that gives rise to a wide spectrum of effects ranging from mere annoyance and inconvenience to genuine terror, I conclude that it is necessary to determine the standing of the Plaintiffs, the interest of the City, the manner, content, and nature of the expression involved, the test to be applied in light of the history of the issue, the precedents, and the conflicting views of First Amendment enforcement, and finally, the balancing of factors upon which this decision rests. Others may perceive shorter cuts to a resolution, but I fail to do so.

It should be noted that, once again, difficult constitutional issues are being presented in an abstract fashion as a result of the class action procedure.[5] The size of the class is, and will remain, unknown. Indeed the issues are presented with an unfortu-

---

3. *See e.g.,* Aeschylus, *Agamemnon* (G.M. Cookson trans., 5 Britannica Great Books 1952) (Clytaemnestra's silencing the public speech of Cassandra); Thucydides, *supra* note 2, at 156–64 (role and transformation of speech as both cause and effect of the disintegration of social relationships and individual character in the face of the collapse of the state).

For contemporary legal discussions of these issues, *see Texas v. Johnson,* 491 U.S. 397, 409,

109 S.Ct. 2533, 2541, 105 L.Ed.2d 342 (1989); *Cohen v. California,* 403 U.S. 15, 24–26, 91 S.Ct. 1780, 1787–89, 29 L.Ed.2d 284 (1971).

4. Harvey Cox, *The Secular City* 41 (1965).

5. *Cf. Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 299 n. 9, 104 S.Ct. 3065, 3072 n. 9, 82 L.Ed.2d 221 (1984); *id.* at 301, 104 S.Ct. at 3073 (Burger, C.J., concurring).

nate degree of abstraction.[6] The course of the proceedings reveals the obstacles that have been met in the effort to present the relevant factual considerations.

The Statute

The Plaintiffs have contended that the following statute contravenes the First, Eighth, and Fourteenth Amendments to the United States Constitution:

A person is guilty of loitering when he:

1. Loiters, remains or wanders about in a public place for the purpose of begging....

N.Y.Penal Law § 240.35(1) (the "Statute").

One would expect the Statute's roots to be deep, and indeed they are. Its post-independence genesis may be found in a 1788 statute that classified as disorderly persons "all persons who go about from door to door or place themselves in the streets, highways or passages, to beg in the cities and towns...." 2 Laws of the State of New York 643 (Weed Parsons 1886). The primary concern of this law and its successors appears to have been keeping able-bodied persons from remaining idle.

Blackstone echoes this concern in his *Commentaries*, noting that "[i]dleness in any person is also a high offence against the public economy." 4 William Blackstone, *Commentaries* *169.[7] He traces this concern back to Ancient Greece, where sturdy vagrants were expelled from cities. The poor laws of sixteenth and early seventeenth century England appear to have drawn one of the clearest distinctions between able-bodied beggars and those who could not support themselves. The former were punished. The latter were initially given relief, but, when that failed, were later licensed. *See* 4 W.S. Holdsworth, *History of English Law* 392–99, 511 (1924); C.J. Ribton–Turner, *A History of Vagrants and Vagrancy and Beggars and Begging* 72–75 (1887).[8]

Prior Proceedings

The Plaintiffs filed this and a companion state action on November 23, 1990. The parties agreed to stay the state action pending the resolution of this lawsuit. In their Complaint, the Plaintiffs seek a decla-

---

**6.** For example, no meaningful statistics have been presented as to the size of the class, the areas affected, or the practices in which the class actually engaged.

**7.** Interestingly, Blackstone also notes that "[u]nder the head of public œconomy may also be properly ranked all sumptuary laws against *luxury*, and extravagant expenses in dress, diet, and the like." 4 William Blackstone, *Commentaries* *170. In England during his time, though, there only remained one such unrepealed law. It prohibited serving a man with more than two courses at dinner or supper, except on specified holidays, when three could be served. *See id.* at *171.

**8.** Despite the extensive efforts to license beggars and enforce complex poverty laws, there continued to be general dissatisfaction with the problem of begging into the late seventeenth century. In fact, the English Board of Trade considered this to be the principal domestic issue of its sessions of 1697. John Locke, who was then serving as Commissioner of Trade, submitted a plan to the Board for solving the problem of "the begging drones" that meted out stiff penalties to those who begged without a license: All able-bodied men between the ages of fourteen and fifty would be sent to sea under strict discipline for three years; all men over fifty years of age or maimed would be sentenced to three years at hard labor at the House of Correction, females over the age of fourteen would be sentenced to three months in the House of Correction; and any boy or girl under the age of fourteen would be "soundly whipped." Maurice Cranston, *John Locke: A Biography* 424–25 (Oxford U. Press 1985) (1957) (quoting Board of Trade Papers of 1679, Public Record Office, London).

Furthermore, counterfeiting begging licenses was to be punished by cutting off the ears of a first offender and transporting a repeat offender "to the plantations." *Id.* at 425. Finally, in Locke's view, poverty and begging were not the result of "scarcity of provisions or want of employment" but rather "the relaxation of discipline and the corruption of manners, virtue and industry." *Id.* at 424. From these observations, Locke proposed that pauper children begin working at the age of *three* not only to learn the requisite discipline and virtue for a productive working life but also to earn the £50 to £60 that it cost the parish under the existing poor laws to feed and teach them until they reached the age of fourteen. *See id.* at 425.

While Locke's plan ultimately was rejected by the Board, it was heralded by some as a manifestation of his "excellent philanthropy." *Id.* (quoting Locke's biographer, H.R. Fox Bourne). Locke's justification for his plan remains an unarticulated basis for the Statute.

ration that § 240.35(1) and the Defendant's enforcement of it violate the First, Eighth, and Fourteenth Amendments to the United States Constitution, pursuant to 42 U.S.C. § 1983. They also seek relief under the New York State Constitution.

The same day they filed this action, the Plaintiffs requested that it be maintained as a class. Their request was granted on April 2, 1991, provided the Plaintiffs submitted a suitable definition of the term "needy." *Loper v. New York City Police Department*, 135 F.R.D. 81, 83 (S.D.N.Y. 1991) (*"Loper I "*). On April 8, 1991, the Plaintiffs provided a further definition of "needy," which was accepted subject to modification as the facts developed. *Loper v. New York City Police Department*, No. 90 Civ. 7546, slip op. at 6, 1991 WL 135631 (S.D.N.Y. July 15, 1991) (*"Loper III "*). Together, *Loper I* and *Loper III* define a Plaintiff Class consisting of all those "needy persons who live in the State of New York, who beg on the public streets or in the public parks of New York City," where a "needy person" is defined as "someone who, because of poverty, is unable to pay for the necessities of life, such as food, shelter, clothing, medical care, and transportation."

Both parties moved for summary judgment in February 1991, before any significant discovery had taken place. Their motions were denied with leave to renew upon further discovery on June 17, 1991. *Loper v. New York City Police Department*, 766 F.Supp. 1280 (S.D.N.Y.1991) (*"Loper II "*).

On November 19, 1991, the Plaintiffs again moved for summary judgment prior to the close of the discovery period. This motion was denied without prejudice as well, principally on the ground that the City had raised a question of fact concerning its enforcement scheme. *Loper v. New York City Police Department*, 785 F.Supp. 464 (S.D.N.Y.1992) (*"Loper IV "*).

The Defendants filed their present motion for summary judgment on April 21, 1992. The Plaintiffs meanwhile filed a motion for additional discovery. The Plaintiffs' motion was granted in part, and the Defendants ordered to turn over additional data to the Plaintiffs, primarily concerning the number of summonses the Department has issued under the Statute. The Plaintiffs then filed a cross-motion for summary judgment. Oral argument on the summary judgment motions was consolidated and heard on July 8, 1992. Final submissions were received on July 20, 1992.

The Facts

### I. *The Plaintiffs*

The Plaintiffs are homeless. They beg on the streets and in the parks of New York City. The money they receive goes towards providing them with food, shelter, clothing, transportation, and medicine. At times, they discuss their plight with those they encounter.

The Plaintiffs have never been arrested for begging, nor have they ever received a summons. The police occasionally order them to stop begging and to move along. The size of the Plaintiff Class is unknown to both parties.

### II. *The Defendants*

The Department enforces the Statute. Data gleaned from summons statistics covering 1986 to the present show the Department has enforced the Statute against a significant number of persons who presumably are members of the Plaintiff Class. A relatively smaller number of class members have been arrested under the Statute. A number of precincts have also initiated aggressive programs under the Statute against people begging in their respective neighborhoods.

The Department's ability, in this day and age, to gather and analyze data is less than satisfactory, and the data it does gather are often inaccurate. One of the Department's original defenses, which has proven amazingly true, is that the vast majority of arrests under the Statute were erroneously listed, and that such arrests should have been properly recorded under another provision of the Statute.

The Defendants have submitted 1,113 arrest reports representing arrests under the Statute from 1986 through June 1992. In most instances, the Statute appears to have

been gratuitously listed on the arrest report in addition to a number of other charges. In most, the description of the events surrounding the arrest shows that those charged were participating in some other sanctionable behavior besides begging. The Defendants plausibly contend that only six of these arrests can be read as involving "peaceful begging." *See* Rosenbaum Decl. (July 17, 1992). The Department does not maintain disposition records, which are stored in a different data base maintained by the New York State Courts and not routinely available to the Department.

As for the summonses, the Department has issued 794 since 1986. The Department does not maintain disposition records for the summons either. In fact, it appears that the only statistic it can produce is that Precinct $A$ generated $x$ summonses under the Statute in a given month. To determine why any particular summons was issued, one would have to consult the issuing officer's notebook, which may or may not have an entry describing the circumstances leading to the summons being issued, and which is maintained by the individual officer. Therefore, one must assume that all of these summonses were issued to members of the Plaintiff Class.

When Loper and Kaye seek alms from others on the sidewalks of New York, police officers occasionally come up to them and ask them to stop begging and move along. *See, e.g.*, Loper Depo. 43–50; Kaye Depo. 29–39. Kaye refrains from soliciting funds in Thompson Square Park because "the police harass me a great deal in that place." Kaye Depo 29.

The Sergeant in charge of the Community Police Unit for the precinct where the Plaintiffs conduct most of their activity has testified by unrebutted affidavit that "asking plaintiffs to move on ... could have been entirely consistent with the 9th Precinct's practice and policy regarding enforcement of Penal Law § 240.35(1) depending upon the circumstances that the officers encountered." Ahearn Decl. ¶ 10. Even though this precinct formally prosecutes people under the Statute rarely, *see*

Sommers Cert. Ex. B (July 7, 1992); Lipton Decl. Ex. A (July 17, 1992), the Statute is used by the Department as a source of authority for restricting the Plaintiffs' assumed rights. As such, the Plaintiffs have suffered a concrete injury.

The Bluszcz Declaration establishes that a strategy designed to curtail begging and panhandling in another neighborhood expressly relied on the authority of the Statute. Under this program, police officers observing people begging on the street warned the beggars that their conduct was illegal and told them to move on. This quickly proved ineffective, however, and the officers began to issue summonses and make arrests under the Statute. *See* Bluszcz Decl. ¶ 8–12. Overall, the program reduced the number of people begging in the neighborhood. Summonses are issued now only to those who fail to comply with a move-on order or who appear to be begging in an "aggressive or intimidating fashion." *Id.* ¶ 12. Assuming the Statute violates the rights of the Plaintiff Class, members of the class have thus suffered concrete injuries by being arrested, issued summonses, and told to move on.

"The Broken Windows"

In addition, the Defendants have presented expert testimony by Professor George Kelling. Professor Kelling has testified without contradiction that beggars and panhandlers indicate to society that disorder has set in. A neighborhood with such people, in which there are broken windows, drug dealers, and youth gangs, is threatening to the society precisely because of the indication of disorder. *See* Kelling Aff.; *see also Young v. New York City Transit Authority*, 903 F.2d 146, 149–50 (2d Cir.) (discussing the exigencies created by begging), *cert. denied*, — U.S. —, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990); Kelling, *Measuring What Matters: A New Way of Thinking About Crime and Public Order*, 2 City J. 21, 24–25 (Spring 1992) (same). Though he tends to lump peaceful and aggressive begging together, *see, e.g.* Kelling Aff. ¶¶ 43–44, the thrust of his testimony is that the police, by enforcing the Statute, seek to reassert an orderly society. Realty

and everyday experience confirm this "Broken Windows" effect.

The Conclusions

### I. *The Plaintiffs Have Standing*

The Defendants first contend the complaint should be dismissed because the named Plaintiffs lack standing. However, assuming the Plaintiffs' conduct is constitutionally protected, they have standing to oppose the Statute on behalf of themselves and the Plaintiff Class. *See International Soc'y for Krishna Consciousness, Inc. v. Lee,* —— U.S. ——, ——, 112 S.Ct. 2701, 2705, 120 L.Ed.2d 541 (1992) (*"ISKCON I"*).

*Loper IV* denied the Plaintiffs' motion for summary judgment in part because the record then failed to establish that the Defendants enforced the Statute. The Defendants have since submitted affidavits showing the Statute is enforced; indeed, it is the very authority relied on by the Department whenever it asks the Plaintiffs to "move along." *See* Ahearn Decl. ¶ 10; *see also* McClellan Decl. ¶ 12; Bluszcz Decl. ¶ 8.

■ Standing is, of course, a "threshold question in every federal case," mandated by Article III's jurisdictional requirement of a justiciable case or controversy between a plaintiff and a defendant. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The following standard applies:

> First, the plaintiff[s] must have suffered an injury in fact—an invasion of a legally-protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citations and internal quotations omitted). *Accord Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).

■ The Department continues to enforce the Statute. Departmental data on summonses issued show that summonses were issued under the Statute in the first five months of this year. Presumably officers still rely on the Statute to ask the Plaintiffs and members of the Plaintiff Class to move along. As long as the Plaintiffs and members of the Plaintiff Class beg on the streets and in the parks, and the Department relies on the Statute to interfere with their assumed rights, there is an actual and imminent threat of injury. *See Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968); *cf. Young,* 903 F.2d at 152–62 (analyzing constitutionality of subway begging regulation). Additionally, at oral argument the Defendants conceded that, although the Department has never directly enforced the Statute against the named Plaintiffs, a threat of enforcement exists.

Cases such as *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), *Whitmore v. Arkansas,* 495 U.S. 149, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990), and *Defenders of Wildlife,* —— U.S. ——, 112 S.Ct. 2130, are distinguishable. In each of those cases, the threat of injury to the plaintiffs was attenuated and unlikely to be repeated on the facts presented. *See, e.g., Defenders of Wildlife,* —— U.S. at ——, —— U.S. ——, 112 S.Ct. at 2138 (plaintiff merely intended to return Sri Lanka "some day"); *Whitmore,* 495 U.S. at 157–58, 110 S.Ct. at 1724–25 (death row inmate's chances of achieving habeas relief and new trial too speculative to allow third-party standing to challenge other inmate's death sentence and to have other inmate's conviction added to comparative review database); *Lyons,* 461 U.S. at 105–06, 103 S.Ct. at 1667 (unlikely plaintiff would encounter police again and be subjected to complained of conduct). Since the Plaintiffs continue to beg and the Department continues to enforce the Statute, the threat of injury to the Plaintiffs is real. *See United States v. Students Challeng-*

*ing Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 688–89, 93 S.Ct. 2405, 2416–17, 37 L.Ed.2d 254 (1973).

The Defendants also rely on *Ellis v. Dyson,* 421 U.S. 426, 95 S.Ct. 1691, 44 L.Ed.2d 274 (1975). There, 'in remanding a challenge to a general loitering statute, the Court suggested in dictum that it was not sure a genuine case or controversy existed. *See id.* at 434, 95 S.Ct. at 1696. Roughly two persons a day were arrested under the statute during the period in question. The Court seemed to doubt that this created a significant enough threat of the plaintiffs being arrest under the statute. *See id.; see also Lyons,* 461 U.S. at 105–06, 103 S.Ct. at 1667.

In one sense, the enforcement scheme here is less threatening than the one at issue in *Ellis.* Only a handful of "pure begging" arrests can be identified; the rest are either erroneously quantified or represent some other form of objectionable behavior. City-wide, roughly ten summonses are issued per month, not counting Port Authority facilities. Yet, in another sense, the Statute is enforced daily through the "move-along" orders of Department personnel. *See also* Kelling Aff. ¶ 6 ("police officers enforce the anti-begging law, not by making arrests, but by asking panhandlers to move on"). No quantitative record exists, though the parties tend to agree that this is the enforcement scheme. The Statute is therefore enforced against the Plaintiff Class in such a way that the threat of harm is real and not attenuated.

The second and third standing requirements are readily satisfied. That the Plaintiffs complain of the conduct of police officers and Departmental policy drawing its authority from the Statute satisfies the second requirement. Granting the requested injunctive relief would preclude the Department from interfering with the assumed rights of those peacefully begging. The Plaintiffs therefore have standing to bring this suit.

## II. Begging is Entitled to First Amendment Protection

In *Young,* the Second Circuit strongly criticized equating begging by people such as the Plaintiffs and solicitation by organized charities for First Amendment purposes. *See* 903 F.2d at 156. The court suggested that this difference emanates from the underlying purposes of each. *See id.* ("While organized charities serve community interests by enhancing communication and disseminating ideas, the conduct of begging and panhandling in the subway amounts to nothing less than a menace to the common good."). This suggestion, though, was dictum. *See id.* at 154 ("Although our holding today does not ultimately rest on an ontological distinction between speech and conduct, we think this case presents a particularly poignant example of how the distinction subsists in right reason and coincides with common sense."); *see also id.* at 164–65 (Meskill, J., dissenting) (beggars deserve the same protection as organized charities); *Loper II,* 766 F.Supp. at 1283.

The Supreme Court recently cast doubt on the Second Circuit's distinction. In *ISKCON I,* — U.S. —, 112 S.Ct. 2701, and *Lee v. International Soc'y for Krishna Consciousness, Inc.,* — U.S. —, 112 S.Ct. 2709, 120 L.Ed.2d 669 (1992) (per curiam) ("*ISKCON II* "),[9] the Court was presented with a challenge to the Port Authority's regulations banning the solicitation of funds and distribution of literature within the metropolitan area's airports. The Second Circuit had held that, under *United States v. Kokinda,* 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990), the airports are non-public fora and it was reasonable for the Port Authority to prohibit the in-person solicitation of funds but not the distribution of literature. *See International Soc'y for Krishna Consciousness, Inc. v. Lee,* 925 F.2d 576, 581–82 (2d Cir. 1991), *aff'd,* — U.S. —, 112 S.Ct. 2701, 120 L.Ed.2d 541 *and* — U.S. —, 112 S.Ct. 2709, 120 L.Ed.2d 669 (1992). Its

---

**9.** Note that the concurring and dissenting opinions in both *ISKCON I* and *ISKCON II* are published together under a separate caption beginning at — U.S. —, 112 S.Ct. 2711, 120 L.Ed.2d 541 (1992) ("*ISKCON III* ").

opinion, which followed *Young,* did not discuss the type of protection the First Amendment provides for this kind of solicitation, but instead simply applied the Supreme Court's *Kokinda* opinions in reaching its result. *See id.*

The Supreme Court generated four substantive opinions in affirming the Second Circuit. Although the Court decided by a 5–4 vote that the airports were not traditional public fora, each of the Justices recognized that in-person solicitation by the plaintiffs was entitled to First Amendment protection. *See ISKCON I,* —— U.S. at ——, 112 S.Ct. at 2705 ("It is uncontested that the solicitation at issue in this case is a form of speech protected by the First Amendment." (citing *Heffron v. International Soc'y for Kirshna Consciousness,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981); *Kokinda,* 497 U.S. 720, 110 S.Ct. 3115; *Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980); *Riley v. National Fed'n of Blind, Inc.,* 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988))); *ISKCON III,* —— U.S. at ——–——, 112 S.Ct. at 2714–15 (O'Connor, J., concurring); —— U.S. at ——, 112 S.Ct. at 2721 (Kennedy, J., concurring) (citing *Riley* and *Schaumburg* ); —— U.S. at ——–——, 112 S.Ct. at 2725–26 (Souter, J., dissenting) (same).

Although the plaintiff in *ISKCON* was a not-for-profit religious corporation, *see ISKCON I,* —— U.S. at ——, 112 S.Ct. at 2703, its solicitation method, known as *sankirtan,* is similar to the method employed by the Plaintiffs. Both involve the face-to-face solicitation of a potentially unsuspecting person walking down the street. The Plaintiffs only solicit funds in a peaceful manner; if their request is turned down, they do not pursue it. *Sankirtan,* on the other hand, can be a much more aggressive and intrusive practice. *See generally International Soc'y for Krishna Consciousness, Inc. v. Barber,* 506 F.Supp. 147, 152–63 (N.D.N.Y.1980), *rev'd on other grounds,* 650 F.2d 430 (2d Cir.1981). Therefore, the only true difference between the two is the eventual ends of the funds contributed.

The *Young* court placed much emphasis on the interests served by organized charities as compared to the simple needs of a beggar. *See* 903 F.2d at 154, 156. Indeed, one finds a common thread through the cases dealing with organized charities: they "solicit." *See, e.g., ISKCON I,* —— U.S. at ——, 112 S.Ct. at 2708; *Schaumburg,* 444 U.S. at 628, 100 S.Ct. at 831; *Murdock v. Pennsylvania,* 319 U.S. 105, 107, 63 S.Ct. 870, 872, 87 L.Ed. 1292 (1943); *Young,* 903 F.2d at 156. The destitute, however, "beg" or "panhandle." In this context, though, the terms are synonymous. To beg is "to ask for as a charity." Webster's New Collegiate Dictionary 100 (1978); *see also Young v. New York City Transit Authority,* 729 F.Supp. 341, 350–51 & n. 19 (S.D.N.Y.), *rev'd and vacated,* 903 F.2d 146 (2d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990). The only difference in meaning is in the pejorative sense "begging" is used; that is, the act of begging has a message associated with it, and that message is discomforting.

As for the ends served, the difference between giving a dollar to a homeless beggar, for example, and the Coalition for the Homeless is largely semantic. Both are charitable acts intended to provide someone with food, clothing, or shelter. The organized charity will take some amount off the top for administrative expenses. It no doubt will also spend some of the dollar to publicize the fact that homeless people do exist and need help. This message, though, is the same exact message the homeless beggar conveys. The beggar just saves on administrative expenses—the commercial essence of the *Schaumburg* trilogy. It is the message that is the same, and that message is entitled to First Amendment protection. *Accord Young,* 903 F.2d at 165–66 (Meskill, J., concurring in part, dissenting in part); *Blair v. Shanahan,* 775 F.Supp. 1315, 1322–23 (N.D.Cal. 1991); *Young,* 729 F.Supp. at 352, 355; *see also First National Bank of Boston v. Bellotti,* 435 U.S. 765, 777, 98 S.Ct. 1407, 1416, 55 L.Ed.2d 707 (1978) ("The inherent worth of the speech in terms of its capacity

for informing the public does not depend upon the identity of its source.").

Begging might also be entitled to some lesser protection as commercial speech. *See Loper II,* 766 F.Supp. at 1285 n. 5. To do so would, however, ignore the difference between the understood quid pro quo that commercial speech seeks and the lack of such a desire in charity.

Moreover, if begging is viewed as only commercial in nature, this Court would be obligated to perform a First Amendment analysis using the test set forth in *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980). The first prong of that test requires a court to ask "whether the expression is protected by the First Amendment," that is, "it at least must concern lawful activity and not be misleading." *Id.; see also id.* at n. 9. This is the question squarely presented here, and to deem begging unlawful simply as a matter of statute is to ignore both that the beggar's request for alms is akin to an organized charity's and that the "Broken Windows" message is inherent in the request.

The distinction between conduct and expression, *compare United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673,

1679, 20 L.Ed.2d 672 (1968) *with Johnson,* 491 U.S. at 406–10, 109 S.Ct. at 2540–42, and whether the Statute is aimed at the activity or the expression fails to assist the resolution of this litigation. The conduct and expression are completely intertwined, and the Statute aims at both.[10] Attempting to draw such lines, especially when faced with a blanket ban such as here, would be an exercise in futility. The core question would still remain.

Finally, Loper, Kaye, and the Plaintiff Class solicit alms in the quintessential public fora—the sidewalks and parks of New York City. *See Frisby v. Schultz,* 487 U.S. 474, 480–81, 108 S.Ct. 2495, 2500–01, 101 L.Ed.2d 420 (1988); *Hudgens v. NLRB,* 424 U.S. 507, 515, 96 S.Ct. 1029, 1034, 47 L.Ed.2d 196 (1976); *Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939) (Roberts, J.). Absent the technical niceties forum analysis generally gives courts to use in avoiding stark issues, this Court must determine whether a blanket ban on begging, as found in the Statute, is constitutional.

## III. *The Statute is Unconstitutional*

Courts and commentators often attempt to place First Amendment issues into neatly carved pigeonholes, from which one is

---

**10.** Solicitation of contributions, regardless of where it takes place, is just one of several activities that have been recognized as "inextricably intertwined with speech or petition," and these activities raise First Amendment issues regardless of whether the regulation is directed at the content of the speech or at the activity that expresses the message. Laurence H. Tribe, American Constitutional Law § 12–7, at 829 (2d ed. 1988). *See Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); *Secretary of State of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984); *Schaumburg,* 444 U.S. 620, 100 S.Ct. 826.

Other activities that can be described either as "speech" or as "conduct" and must be "assessed with particular sensitivity to the possible. construction of that breathing space which freedom of speech requires in the society contemplated by the first amendment," Tribe, *supra,* § 12–7, at 830, include the following: outdoor distribution of pamphlets, *see United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983); *Heffron,* 452 U.S. 640, 101 S.Ct. 2559; door-to-door political canvassing, *see City of*

*Watseka v. Illinois Pub. Action Council,* 479 U.S. 1048, 107 S.Ct. 919, 93 L.Ed.2d 972 (1987) (mem.); *Martin v. Struthers,* 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943); mailbox stuffing, *see United States Postal Serv. v. Council of Greenburgh Civic Ass'ns,* 453 U.S. 114, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981); picketing, *see Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *Carey v. Brown,* 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980); civil rights demonstrations, *see Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969), and boycotts, *see NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982); communicating with the government, *see Minnesota State Bd. for Community Colleges v. Knight,* 465 U.S. 271, 104 S.Ct. 1058, 79 L.Ed.2d 299 (1984); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); and posting outdoor notices, *see Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984), and signs, *see Metromedia, Inc. v. San Diego,* 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981).

released onto self-executing flight paths of analysis. By restricting issues and evoking shibboleths, courts resolve core issues without facing them and ultimately threaten the conceptual coherence of those First Amendment rights they are interested in protecting.[11] Conduct and expression are inexplicably intertwined here. The simple question is: "Can society ban all forms of begging?" The simple answer is: "No."

### A. The Applicable Tests

■ In *Young*, the Second Circuit employed the standard set forth in *O'Brien*, 391 U.S. at 377, 88 S.Ct. at 1679, in analyzing the Transit Authority's regulation banning begging in the subways. The *O'Brien* test is normally used to analyze government regulation of conduct that may have an expressive element.

> Under *O'Brien*,
> a government regulation is sufficiently justified when: (1) it is within the constitutional power of the Government; (2) it furthers an important or substantial governmental interest; (3) the governmental interest is unrelated to the suppression of free expression; and (4) the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Young*, 903 F.2d at 157 (internal quotations omitted).

■ Merging with *O'Brien* is the standard used to assess time, place, and manner restrictions on "pure speech" in traditional public fora. *See ISKCON III*, — U.S. at —— – ——, 112 S.Ct. at 2720–21 (Kennedy, J., concurring). Such restrictions are valid

> provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alter-

native channels for communication of the information.

*Clark*, 468 U.S. at 293, 104 S.Ct. at 3069.

As Justice Kennedy observed in *ISK-CON*, "[t]he confluence of the two tests is well demonstrated by a case like this, where the government regulation at issue can be described with equal accuracy as a regulation of the manner of expression, or as a regulation of conduct with an expressive component." *ISKCON III*, — U.S. at ——, 112 S.Ct. at 2721 (Kennedy, J., concurring); *see also Jews for Jesus, Inc. v. Jewish Community Relations Council of New York, Inc.*, 968 F.2d 286, 295–96 (2d Cir.1992); *Young*, 903 F.2d at 158–59. The principles underpinning the tests are not much different, and are succinctly summarized in terms of the time, place, and manner test: regulations must be neutral, support substantial governmental interests, and not completely ban the speech at issue. *See Loper II*, 766 F.Supp. at 1287.

### B. Neutrality

■ Walking through New York's Times Square, one is bombarded with messages. Giant billboards and flashing neon lights dazzle; marquees beckon; peddlers hawk; preachers beseech; the news warily wraps around the old Times Building; and, especially around the holidays, the Salvation Army band plays on. One generally encounters a beggar too. Of all these solicitors, though, the only one subject to a blanket restriction is the beggar.

"Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." *Regan v. Time, Inc.*, 468 U.S. 641, 648–49, 104 S.Ct. 3262, 3267, 82 L.Ed.2d 487 (1984). This prohibition even extends to the commercial arena, where such regulations raise "the specter that the Government may effective-

---

11. As one constitutional scholar has commented:
> More fundamentally, the fragmentation of the first amendment into a grab bag of rubrics under which different types of speech receive different degrees of protection exemplifies a propensity for pigeonholing as a method of deciding first amendment questions. Such a method masks the political dimension of the

underlying choices by pretending to cabin judicial discretion within the limits established by the categories themselves. This sort of pigeonholing endangers the pigeon: if one parses first amendment doctrine too finely, one may soon discover that little protection for expression remains.

Tribe, *supra* note 10, § 12–18, at 943–44 (citations omitted).

ly drive certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.,* — U.S. —, —, 112 S.Ct. 501, 508, 116 L.Ed.2d 476 (1991). It is in only narrowly drawn instances that such regulations are allowed, and then only because of the constitutionally proscribable content of such speech. *See R.A.V. v. City of St. Paul,* — U.S. —, —, 112 S.Ct. 2538, 2543, 120 L.Ed.2d 305 (1992) (listing, as examples, obscenity and defamation); *Simon & Schuster,* — U.S. at —, 112 S.Ct. at 514 (Kennedy, J., concurring) (obscenity, defamation, incitement, grave and imminent danger).[12]

The State extensively regulates charities and how they may solicit funds. *See, e.g.,* N.Y.Exec.Law § 171-a *et seq.* This licensing scheme, as Defendants noted at oral argument, is a principal reason why the Salvation Army, or one of any number of charitable organizations, can solicit funds on the sidewalks of New York. Presumably, this licensing scheme exempts these organizations from the Statute's scope, though facially the Statute lacks such an exemption. *See C.C.B. v. State,* 458 So.2d 47, 48 (Fla.Dist.Ct.App.1984).

Whether the Statute is aimed at activity, *see O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679, or expression, *see Johnson,* 491 U.S. at 406–10, 109 S.Ct. at 2540–42, it treats solicitors standing side-by-side differently. If the solicitor is an organized charity, the solicitation is permitted. If the solicitor is a beggar, the solicitation is criminal. The Defendants argue in part that the difference is justified due to the "Broken Windows" message beggars convey. As such, the regulation is aimed at the content of a beggar's expressive conduct and is thus impermissible absent some over-riding governmental interest. *See Simon & Schus-*

*ter,* — U.S. at —, 112 S.Ct. at 509–10; *Johnson,* 491 U.S. at 410, 109 S.Ct. at 2542.

### C. The Total Ban

Governmental regulation of speech, whether direct or incidental, may be allowed provided alternative means of presenting the message exist. Unless a well-defined area of speech that can be proscribed is at issue, *see R.A.V.,* — U.S. at —, 112 S.Ct. at 2543, a blanket ban on a particular form of speech or on a particular message is not tolerated, *see Simon & Schuster,* — U.S. at — – —, 112 S.Ct. at 513–15 (Kennedy, J., concurring); *Young,* 903 F.2d at 160.

It is the Statute's total ban on begging that requires the injunction. One can readily imagine scenarios in which the Government could permissibly ban some begging. For example, a ban on aggressive begging would probably survive scrutiny, *see C.C.B.,* 458 So.2d at 49, as would a ban on begging immediately outside ATMs, *see Frisby,* 487 U.S. at 486–87, 108 S.Ct. at 2503–04. A regulation prohibiting all solicitation in a ten-block radius from Grand Central Station during the rush hour no doubt might constitute a reasonable time, place, and manner restriction. *See ISKCON I,* — U.S. at — – —, 112 S.Ct. at 2708–09. But, contrary to the situation presented in *Young, see* 903 F.2d at 160, the Statute cuts off all means of allowing beggars to communicate their message of solicitation. See *ISKCON III,* — U.S. at —, 112 S.Ct. at 2723 (Kennedy, J., concurring); *Clark,* 468 U.S. at 295, 104 S.Ct. at 3070.

However, even a reasonable time, place, and manner restriction analysis begs the issue, since the conduct so prohibited is more often reached by other provisions of New York's Penal Law as set forth in the

---

**12.** When the government acts to restrict speech on the basis of its content, it is attempting to control the actions of individuals "by forbidding the expression of beliefs and attitudes in order to shape directly the way in which people think. Thus, by acknowledging as legitimate the general right of government to control expression one thereby commits oneself to acknowledging as legitimate the right of a government to control thought." Robert F. Landenson, *Free Speech in*

*the Workplace and the Public–Private Distinction,* 7 Law & Phil. 247, 255 (1988–89). But as John Stuart Mill argued, such an acknowledgement concedes to the government the quality of infallibility regarding its ability to determine just what thoughts a person is to have in order to protect the individual and the society. *See* John Stuart Mill, *On Liberty* 21–23 (Bobbs–Merrill 1956) (1859).

facts above and noted below. Indeed, to be a reasonable restraint, the conduct prohibited would have to offend some condition, other than speech, to justify the prohibition.

### D. The State of the Law

Although bound by the decisions referred to above, this case, and those that precede it, show that many of the distinctions and tools that have developed in First Amendment jurisprudence are nothing more than devices to avoid squarely facing the conflict between the First Amendment and majoritarian will.[13] Time, place, and manner restrictions, forum categorization, and speech distinctions all allow courts to avoid balancing the majority's will against the First Amendment's anti-majoritarian tenor. *See International Soc'y for Krishna Consciousness*, 925 F.2d at 584 n. 2 (Oakes, C.J., dissenting).

### 1. The Inevitable Balancing of Interests

When this balancing task is actually undertaken, it is not, of course, performed with evenly balanced scales—a heavy weight already sits on the First Amendment's side. *See Simon & Schuster*, — U.S. at —, 112 S.Ct. at 514 (Kennedy, J., concurring). And this "heavy weight" is nothing other than the "thumb" of the court pressing down on the scales on the side of the speech in question[14] "to assure that the balance struck in any particular situation properly reflects the central position of free expression in the constitutional scheme." Tribe, *supra* note 10, at 791.

While constitutional scholars have expended a tremendous amount of energy to identify and explicate the alternative tests courts employ in reviewing the constitutionality of such regulations, decisions involving the balancing of the relevant competing interests necessarily must be undertaken. Even the court's analysis of those governmental regulations directly proscrib-

ing the content of speech, which are held to be presumptively violative of the First Amendment, involves, at least implicitly, the balancing of competing private and societal interests.

In those cases where a court refuses to engage in the balancing procedure as unnecessary, it will find the regulation at issue to be unconstitutional unless the government can overcome the presumption by showing that the content of the speech in question presents a "clear and present danger," constitutes defamatory falsehood, or falls into one of the unprotected categories of speech the Supreme Court has identified. *See id.* The result of these varied approaches is that First Amendment jurisprudence has become a hodgepodge of categories and tests that only appear to permit the avoidance of the direct conflict between competing considerations by employing semantic distinctions and artificial rubrics such as attempting to differentiate among crowded New York sidewalks, post office sidewalks, airport halls, and subway passageways.

These alternative approaches, however, necessarily involve the balancing of interests in at least two stages: first, in determining what is to count as a category of unprotected speech; and second, in determining within which category a specific speech act is to fall.[15] Thus, the "hobgoblin" of balancing interests is unavoidable in the First Amendment context.[16] Any First Amendment issue can be satisfactorily analyzed only if the demon is openly confronted and exorcised through an application of the balancing calculus, even in those cases where the government regulation is directed squarely at the content of the speech and not merely at its noncommunicative effect. Drawing fine lines between alternative analyses seeks—but fails—to estab-

---

13. *See supra* note 11.

14. *See* Harry Kalven, Jr., *The Concept of the Public Forum*, 1965 Sup.Ct.Rev. 1, 28.

15. *See* T.M. Scanlon, Jr., *Freedom of Expression and Categories of Expression*, U.Pitt.L.Rev. 519,

537–42 (1979) (discussing the identification, assignment of weights, and weighing of categories of interests and categories of speech).

16. The term is Professor Kalven's. *See* Kalven, *supra* note 14, at 27.

lish a rational basis for decisions.[17] Recognizing and grappling with the tension between the content of speech and the ideas behind it, on the one hand, and the security and privacy of the individual and society, on the other, are necessary and true to the Amendment's core.

The First Amendment balancing calculus contains three interest variables: the speaker's interests, the specific audience's interests, and the general public's interests.[18] There is also a fourth unifying interest variable, namely, the Government's interest in protecting and promoting all of these other interests. Each of these variables is complex in nature and conflicts can arise both within a particular variable as well as among the different variables.

### 2. The Speaker's Interest

The speaker's primary interest is that of being able to call something to the attention of a wide audience. In this case, the speaker's interest is the impoverished person's interest in calling his condition to the attention of the general public, and in directly soliciting funds on his own behalf from anyone who will listen. The beggar's personal message also contains a broader social message even when it is not explicitly presented to his audience. This is the flip-side of the "Broken Windows" message that so concerns the Defendants. It is the message that social and economic conditions and opportunities and governmental services are such that many people are unable to support themselves and must rely on the freely given alms of others in order to eke out an existence while living on the streets of New York. This too is a critical message that the beggar has a genuine and legitimate interest in presenting to the public at large.

Of course, "[t]he type of protection that a given kind of expression requires is not

determined by [the speaker's] values alone. It also depends on such factors as the costs and benefits to non-participants and the reliability of available forms of regulation." Scanlon, *supra* note 15, at 523. This then requires an analysis and weighing of the interests of the audience, the public affected by this form of expression, and the government.

### 3. The Audience's Interest

The audience has a primary interest is having information readily available to it. The First Amendment protects and promotes this interest by fostering a climate in which information can flow freely from speakers to whom the listener can turn when she is in need of information. The audience interests also include interests in not being defrauded (discussed below), in being informed about social conditions, and in having one's personal privacy respected. This last interest includes a variety of privacy concerns, including the person's interest in the content of information that is disseminated about herself, the manner in which that information is disseminated, and the manner in which the person is confronted by information generally in both the public and private spheres.

The interest in privacy also goes to the heart of one's right to be left alone, to decide whether or not to even be an actual audience member, and to enjoy public facilities without interference.[19] Of course, this interest appears to be encroached upon when a speaker thrusts his message before the person in such a way that the latter cannot help but become an unwilling member of the audience. *See* Franklyn S. Haiman, *Speech v. Privacy: Is There a Right Not To Be Spoken To?*, 67 Nw.U.L.Rev. 153, 187–92 (1972). But the concern about this right to privacy is tempered by the fact that it is also in the audience's interest to

---

17. *See supra* note 11.

18. *See* Scanlon, *supra* note 15, at 521–28 (discussing the interests of the participants, audience, and bystanders).

19. It is this set of individual privacy interests, which the potential audience member has as she

is in the public space or uses public facilities, that is protected by content-neutral regulations on the time, place, or manner of another's speech. *See Carey,* 447 U.S. at 470, 100 S.Ct. at 2295; *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 209, 95 S.Ct. 2268, 2272, 45 L.Ed.2d 125 (1975).

be exposed to expression even when it may come in unwelcome forms: [20]

> What audiences generally want ... is to have expression available to them should they want to attend to it. Expression that grabs one attention whether one likes it or not is generally thought of as a cost. But it should not be thought of as a cost, even from the audience's point of view. As Mill rightly emphasized, there is significant benefit in being exposed to ideas and attitudes different from one's own, *though this exposure may be unwelcome.* If we had complete control over the expression we are exposed to, the chances are high that we would use this power to our detriment. The important and difficult question however, is, when unwanted exposure to expression is a good thing from the audience's point of view.

Scanlon, *supra* note 15, at 524 (emphasis added). However, the assigning of weights and balancing of competing concerns within the audience's interests are not easily performed, and this is particularly so in hard cases like the one at hand.

In *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), the Court was faced with an offensive communication made to the general public within the confines of the Los Angeles County courthouse. There, Cohen entered the courthouse wearing a jacket with the words "Fuck the Draft" printed on it to express his feelings about the Vietnam War and the draft. Cohen was arrested and prosecuted under a statute making it illegal to willfully disturb the peace or quiet of any neighborhood or person by offensive conduct. *See id.* at 16, 91 S.Ct. at 1783. The Court held that the statute violated Cohen's First and Fourteenth Amendment rights as it balanced those rights against the limited privacy rights of even the most sensitive members of his audience:

> [M]uch has been made of the claim that Cohen's distasteful mode of expression was thrust upon unwilling or unsuspecting viewers, and that the State might therefore legitimately act as it did in order to protect the sensitive from otherwise unavoidable exposure to appellant's crude form of protest. Of course, the mere presumed presence of unwitting listeners or viewers does not serve automatically to justify curtailing all speech capable of giving offense. While this Court has recognized that government may properly act in many situations to prohibit intrusion into the privacy of the home ..., we have at the same time consistently stressed that we are often "captives" outside the sanctuary of the home and subject to objectionable speech. *The ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is, in other words, dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner.* Any broader view of this authority would effectively empower a majority to silence dissidents simply as a matter of personal predilections.

*Id.* at 21, 91 S.Ct. at 1786 (citations and internal quotations omitted, emphasis added). *Accord Consolidated Edison Co. v. Public Serv. Comm'n,* 447 U.S. 530, 541, 100 S.Ct. 2326, 2335, 65 L.Ed.2d 319 (1980).

The Court then addressed the diminished privacy interest of the individual once she has left her home and entered public space, concluding that, "while it may be that one has a more substantial claim to a recognizable privacy interest when walking through a courthouse corridor than, for example, strolling through Central Park, surely it is

**20.** *See e.g. Simon & Schuster,* —— U.S. at ——, 112 S.Ct. at 509 ("if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection," quoting *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 55, 108 S.Ct. 876, 882, 99 L.Ed.2d 41 (1988) and *FCC v. Pacifica Foundation,* 438 U.S. 726, 745, 98 S.Ct. 3026, 3038, 57 L.Ed.2d 1073 (1978)); *Stanley v. Georgia,* 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542 (1969) (discussing the right to be spoken to and to receive information and ideas, "regardless of their worth"); *Lamont v. Postmaster General,* 381 U.S. 301, 308, 85 S.Ct. 1493, 1497, 14 L.Ed.2d 398 (1965) (Brennan, J., concurring) ("It would be a barren marketplace of ideas that had only sellers and no buyers.").

nothing like the interest in being free from unwanted expression in the confines of one's own home." *Id.* at 21–22, 91 S.Ct. at 1786. Accordingly, the privacy interests of the most sensitive individuals who are in a government building, while being greater than the privacy interests those individuals would have in a public park or on a sidewalk,[21] are still insufficient to justify restricting a speaker's right to express himself even when that expression is obscene and offensive in nature.[22]

A central consideration in the Court's decision was the control the audience continued to have over deciding whether to "listen" to Cohen's expression:

> [P]ersons confronted with Cohen's jacket were in a quite different posture than, say, those subjected to the raucous emissions of sound trucks blaring outside their residences. Those in the Los Angeles courthouse could effectively avoid further bombardment of their sensibilities simply by averting their eyes.... [W]e do not think the fact that some unwilling "listeners" in a public building may have been briefly exposed to [Cohen's speech] can serve to justify this breach of the peace conviction where, as here, there was no evidence that persons powerless to avoid appellant's conduct did in fact object to it, and where that portion of the statute upon which Cohen's conviction rest evinces no concern ... with the special plight of the captive auditor, but, instead, indiscriminately sweeps within its prohibitions all "offensive conduct" that disturbs "any neighborhood or person."

*Id.* at 21–22, 91 S.Ct. at 1786 (citations omitted). Thus, the state was not justified in intervening into the relationship between speaker and audience when that audience was not "captive" and the statute being enforced did not address the status or interests of the audience.[23]

In its subsequent opinions, the Supreme Court has commented on the considerations identified in *Cohen,* noting that

> [t]he plain, if at times disquieting, truth is that in our pluralistic society, constant-

---

**21.** The individual's right to privacy in the public space is severely limited because "[w]herever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague,* 307 U.S. at 515, 59 S.Ct. at 964. And "'streets, sidewalks, parks, and other similar public places are so historically associated with the exercise of First Amendment Rights that access to them for the purpose of exercising such rights cannot be constitutionally be denied broadly and absolutely.'" *Hudgens,* 424 U.S. at 515, 96 S.Ct. at 1034 (quoting *Amalgamated Food Employees Union v. Logan Valley Plaza, Inc.,* 391 U.S. 308, 315, 88 S.Ct. 1601, 1607, 20 L.Ed.2d 603 (1968), in the context of picketing). Finally, "[n]o particularized inquiry into the precise nature of a street is necessary [because] all public streets are held in the public trust and are properly considered traditional public fora." *Frisby,* 487 U.S. at 481, 108 S.Ct. at 2500.

**22.** In *Erznoznik,* the Court struck down a municipal ordinance making it unlawful for drive-in theaters to show films containing nudity that were visible from public streets. The Court found that "the screen of a drive-in theater is not 'so obtrusive as to make it impossible for an unwilling individual to avoid exposure to it' [citation omitted]," and held that "the limited privacy interest of persons on the public streets cannot justify this censorship of otherwise protected speech on the basis of its content." 422 U.S. at 212, 95 S.Ct. at 2274.

**23.** In *Consolidated Edison Co.,* the Court struck down the New York Public Service Commission's prohibition against bill inserts and concluded that "[w]here a single speaker communicates to many listeners, the First Amendment does not permit the government to prohibit speech as intrusive unless the 'captive' audience cannot avoid objectionable speech." 447 U.S. at 541–42, 100 S.Ct. at 2335.

Furthermore, in holding that the privacy interest one has at home extends to control over one's mailbox, the Court distinguished between being a captive audience in one's home and being a captive audience outside of the home: "That we are often 'captives' outside the sanctuary of the home and subject to objectionable speech and other sound does not mean we must be captives everywhere. The asserted right of a mailer ... stops at the outer boundary of every person's domain." *Rowan v. United States Post Office Dep't,* 397 U.S. 728, 738, 90 S.Ct. 1484, 1491, 25 L.Ed.2d 736 (1970) (citation omitted). *See also Frisby,* 487 U.S. at 485, 108 S.Ct. at 2503 ("we have been careful to acknowledge that unwilling listeners may be protected when within their own homes"); *Carey* 447 U.S. at 471, 100 S.Ct. at 2295 (reviewing the Court's "solicitude for the right of an individual 'to be left alone' in the privacy of the home").

ly proliferating new and ingenious forms of expression, we are inescapably captive audiences for many purposes. Much that we encounter offends our esthetic, if not our political and moral, sensibilities. Nevertheless, the Constitution does not permit government to decide which types of otherwise protected speech are sufficiently so offensive to require protection for the unwilling listener or viewer. Rather, absent [a showing that substantial privacy interests are being invaded in an intolerable manner], the burden normally falls upon the viewer to avoid further bombardment of his sensibilities simply by averting his eyes.

*Erznoznik*, 422 U.S. at 210–11, 95 S.Ct. at 2273 (citations and internal quotations omitted).

When the Plaintiffs or members of the Class in the matter at hand approach a potential listener on the street or in a park, that person, like members of Cohen's audience, is not a captive: He can turn away, shake his head before the expression is uttered, avert his eyes and refuse to acknowledge the speaker, or he can listen to the message and then decide how to respond to the speaker's personal appeal. Most significantly, the potential listener's control over this situation is ultimately indistinguishable from his control over the situation in which protected forms of speech are thrust upon him by persons soliciting contributions for charitable organizations on the street or by persons pamphleteering for religious or political causes on his doorstep. *See supra* Section II.

The audience's interests under the facts at hand make the outcome of the balancing test quite close, but the scales ultimate tip in the speaker's favor. In the final analysis, the record fails to support the conclusion that substantial privacy interests of the audience are being invaded in an intolerable manner by the personal petitions made by the Plaintiffs and the Class for alms. *See Cohen*, 403 U.S. at 21, 91 S.Ct. at 1786. Therefore, the burden properly falls upon the audience to protect its sensibilities from any offense that the expressive act of begging may give rise to by acting in any of the ways described. The burden is not upon the state to protect the audience by enforcing a blanket restriction on this kind of speech. And, *pace* the dictum in *Young*, 903 F.2d at 154, regarding the menacing content of the beggar's expression, the message conveyed may benefit the audience in terms of its social, political, or economic content even if it is reluctantly or unwillingly received.

### 4. The Government and Public Interests

The final variables to be plugged into the First Amendment balancing analysis are the interests of bystanders (*i.e.*, those members of the general public who are not part of the audience but nonetheless may be affected, directly or indirectly, by the speaker's act of expression) and the government. The government's interest is, of course, all-encompassing: It includes the interest in simultaneously protecting and promoting the various aforementioned interests of speakers, audiences, and bystanders. Here the government interest as it relates to audiences and bystanders is analyzed.

The Defendants correctly contend the Statute serves the substantial governmental, audience, and bystander interests of protecting the public order and protecting people from fraud.

#### a. Public Order

The public order argument falls into two parts. First is the prohibition of behavior often associated with begging, such as aggressive panhandling, the disruption of traffic, interference with commercial establishments, etc. Second is Professor Kelling's "Broken Windows" premise.

As to the first argument, the Statute is overbroad. The State already prohibits some of the activity suggested as a justification for this Statute. For example, the Defendants argue the Statute is effective in combatting people who block major intersections while begging. Section 240.20(5) already provides such a tool. *See* N.Y. Penal Law § 240.20(5) (person is guilty of disorderly conduct when obstructing vehicular or pedestrian traffic). Like-

wise, the overbearing beggar might be in violation of § 240.25(3) or (5), which prohibit general harassment. The beggar shaking down people in parking lots is both trespassing, *see id.* § 140.05 *et seq.,* and extorting, *see id.* § 155.05(2)(e). *See also Blair,* 775 F.Supp. at 1324.

The Defendants argue that these statutes are not effective tools since intent must be shown under each. However, scienter generally is a critical element of a criminal offense. *See United States v. Schneiderman,* 777 F.Supp. 258, 266–68 (S.D.N.Y.1991), *rev'd,* 968 F.2d 1564 (2d Cir.1992). The Defendants also argue that these statutes cannot account for the myriad ways someone may engage in panhandling. To the extent such behavior can be prohibited, though, the more proper course is a narrowly-drafted statute, not a blanket ban. From this standpoint, then, a public order argument will support a blanket ban only if a blanket ban is permissible.

The "Broken Windows" argument is directed at more nebulous quality of life concerns and the ability of society to ban those things it finds offensive. Professor Kelling equates petty crime and inappropriate behavior with disorder—that the presence of panhandlers, for instance, means that society has ceded control. *See* Kelling, *supra,* at 24–25. Drug sales and use, public drinking, street gangs, and graffiti lead to high levels of fear. *See id.* at 26. Broken turnstiles, litter, graffiti, the homeless, and panhandlers lead one to believe crime is more frequent and no one is in charge, increasing the perception of fear. *See id.* at 28.

From this, Kelling argues that the police should be able to enforce the law in an effort to reestablish order. Kelling Aff. ¶ 7. While the Defendants should be able to deter most of the behavior Kelling and the vast majority of New Yorkers find objectionable, the authority for this activity must be more narrowly defined.

A peaceful beggar poses no threat to society. The beggar has arguably only committed the offense of being needy. The message one or one hundred beggars sends society can be disturbing. If some portion of society is offended, the answer is not in criminalizing those people, debtor's prisons being long gone, but addressing the root cause of their existence. The root cause is not served by removing them from sight, however; society is then just able to pretend they do not exist a little longer.

Professor Kelling's approach would simply remove the messenger of bad news from the City's streets, or at least from neighborhoods where the Statute was enforced. That society finds a particular message disturbing, though, has never been a justification from criminalizing that message, absent certain well-defined exceptions not applicable here. *See, e.g., R.A.V.,* — U.S. at ——, 112 S.Ct. at 2543; *Johnson,* 491 U.S. at 408–09, 109 S.Ct. at 2541–42. Indeed, such a concept is antithetical to the First Amendments' core. As the beggar's solicitation is entitled to First Amendment protection, *supra,* society cannot totally ban it just because it is disturbed by the message it relates. *See Young,* 903 F.2d at 160.

Professor Kelling also suggests the Statute is not unconstitutionally applied because police officers generally do not disturb the peaceful beggar. *See* Kelling Aff. ¶ 43. *But see* Bluszcz Decl. ¶ 9. However, if this is so, the Statute delegates overly broad discretion to the ultimate decision-maker. *See Forsyth County v. Nationalist Movement,* — U.S. ——, ——–——, 112 S.Ct. 2395, 2400–01, 120 L.Ed.2d 101 (1992).

#### b. Fraud

The fraud argument, often made in the charitable speech context, sometimes fails to pass muster. *See Schaumburg,* 444 U.S. at 636–38, 100 S.Ct. at 835; *ISKCON III,* — U.S. at ——–——, 112 S.Ct. at 2725–26 (Souter, J., dissenting). The argument here is that the beggar's plea is inherently misleading because the City and a number of charitable organizations already provide the homeless with food, medicine, clothing, and shelter, and there is no way to monitor whether beggars actually use their receipts for the announced purposes or for more self-destructive ends, such as the purchase of tobacco, alcohol, or drugs.

While it is true that the Defendants have an interest in preventing fraud, and it is true that Government and private organizations go to great lengths to try to address the problems faced by the homeless, even a casual reader of the newspaper knows that these services do not meet the great need presented. *See also* New York City Commission on the Homeless, *The Way Home: A New Direction in Social Policy* 4 (Feb. 1992) ("Despite the unprecedented level of resources and energy devoted to addressing the problem of homelessness, not a single member of this Commission, nor any New Yorker with whom we have spoken, would claim a job well done."). The availability of services is therefore at best equivocal.

As for the inability to track what people do with the funds received, this too must be examined in light of the blanket ban the Statute presents. Even if society is truly bothered by such problems, it is doubtful that it is prepared to borrow a page from English history and license the truly needy. *See Young,* 729 F.Supp. at 353. The conversion of begging into a licensed profession would demonstrate the barrenness of the societal response to the underlying problem.

Finally, the Defendants note that panhandling is rife with possibilities for misleading those who are the subjects of the panhandler's entreaty. Daily experience demonstrates the veracity of this position, and the Defendants have presented some evidence to that effect. Nevertheless, this type of vague allegation cannot support a blanket ban on speech. *ISKCON III,* —— U.S. at ——, 112 S.Ct. at 2726 (Souter, J., dissenting). Those cases that do allow a partial ban on solicitation for reasons of fraud or coercion do so only in the absence of a complete ban on solicitation, contrary to the provisions of this Statute. *See* —— U.S. at ——, 112 S.Ct. at 2723 (Kennedy, J., concurring); *Shapero v. Kentucky Bar Ass'n,* 486 U.S. 466, 477, 108 S.Ct. 1916, 1923, 100 L.Ed.2d 475 (1988).

### 5. The Outcome of the Balancing Test

"If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive and disagreeable." *Johnson,* 491 U.S. at 414, 109 S.Ct. at 2544.[24] This principle imposes an inevitable burden on a certain segment of the society that requires them to sacrifice a portion of their privacy and comfort as they enter into the interpersonal world of the society that surrounds them. This principle requires a trade-off: When leaving the insular security of one's home and becoming a participant in the world organized by society, one interacts with its elements. This necessarily includes those who have different viewpoints and backgrounds. Paying attention is not a requirement. Instead, ignoring or answering back with more speech is a reciprocal privilege. In turn, if the disturbing message has substance, the hope is it will be heeded in due time, and society strengthened through resilience, not rigidity. *See id.* at 419, 109 S.Ct. at 2547.

Here, the Court is presented with a Statute that imposes a blanket ban on conduct with an expressive component entitled to some First Amendment protection. It does this in a manner directed at the content of that expression by allowing the organized charity to solicit on the street while preventing the unorganized beggar from doing so. *See supra* note 10. While the Government has a valid interest in preventing fraud, preserving public order, and protecting and promoting the interests of audiences and bystanders, the interest in permitting free speech and the message begging sends about our society predominates. Section 240.35(1) is therefore unconstitutional under the First Amendment to the United States Constitution, as applied to the states.

### IV. The Other Claims

The Plaintiffs also attack the Statute under the Eighth and Fourteenth Amend-

---

**24.** Again, Mill provides one of the most sophisticated and compelling arguments supporting this conclusion in *On Liberty. See* Mill, *supra* note 12.

ments to the United States Constitution. In light of the above and because only declarative relief is sought, it is not necessary for the Court to address these claims. The Court does note, however, that the Eighth Amendment claim, which contends the Statute creates a status offense, has little merit.

As to claims against the Statute under the New York State Constitution, the Court abstains from considering these claims. *See Young,* 903 F.2d at 163–64.

Conclusion

For the reasons set forth above, the Plaintiffs' motion for summary judgment is granted and the Defendants' motion is denied. Section 240.35(1) is deemed unconstitutional. Judgment for the Plaintiffs and a permanent injunction barring the Defendants from enforcing the Statute will be entered.

It is so ordered.